| | |
|---|---|
| IN THE UNITED STATES DISTRICT COURT<br>FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION | |
| STELLA SOSA WOLF,<br><br>     Plaintiff,<br><br>v.<br><br>SAINT ANTHONY HOSPITAL, an Illinois corporation,<br><br>     Defendant. | Case No. 1:21-cv-3273<br><br>Judge Manish S. Shah<br><br>Mag. Judge Susan E. Cox<br><br>Jury Trial Demanded |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Stella Sosa Wolf ("Plaintiff" or "Wolf") dedicated four years of her life to Defendant Saint Anthony Hospital ("Defendant," "SAH," or "Hospital") as the head of Human Resources. In her role, Wolf worked closely with SAH Chief Executive Officer Guy Medaglia ("Medaglia"), but their relationship deteriorated after Wolf pushed back against Medaglia, including by refusing to participate in an apparent pay-to-play scheme exchanging an insurance contract with then-Speaker of the Illinois House Michael Madigan's son Andrew Madigan for more favorable state financial support. In response to Wolf's refusal to "play ball" with Madigan, the Hospital engaged in a campaign of retaliatory harassment including denying Wolf a merit increase, undergoing an extraordinary investigation of Wolf's demeanor, undermining Wolf's authority and excluding her from decisions, until finally firing her during an approved medical leave under the Family Medical Leave Act. Although SAH asserts Wolf's position was eliminated as a part of a Reduction in Force ("RIF"), Wolf's position was not terminated at the same time as those who were included in the RIF, she was not listed in the list of HR personnel who would be laid off, Wolf did not meet the stated criteria for the RIF, no documents support the rationale for including Wolf in the RIF, and her

1

position was not eliminated but instead re-titled. SAH now moves for Summary Judgment. For the reasons below, this Court should deny SAH's motion and allow a jury to determine whether Wolf's asserted inclusion in the RIF was a pretext for retaliation and a violation of the FMLA.

## Factual Background

Wolf incorporates her Statement of Additional Facts ("Pl. SOF") and Response to Defendant's Statement of Material Facts ("Pl. Rep. Def. SOF") for brevity.

## Argument

SAH has not met its burden entitling it to Summary Judgment. Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court construes all facts and draw all inferences in favor of Wolf as the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377-78 (7th Cir. 2020).

I.  **GENUINE ISSUES OF DISPUTED MATERIAL FACTS PRECLUDE SUMMARY JUDGMENT ON WOLF'S WHISTLEBLOWER CLAIMS**

   A.  **The Illinois Whistleblower Act Protects Wolf Who Refused to Participate in a Pay-to-Play Scheme by Obtaining Competitive Bids for SAH's Benefits Business Instead of Awarding a No-Bid Contract to Andrew Madigan.**

Plaintiff need not have "blown the whistle" to have a claim under the Illinois Whistleblower Act. (Mot. at ¶ 3; Mem. at 5-6.) *See Spratt v. Bellwood Pub. Library,* 380 F. Supp. 3d 783, 790 (N.D. Ill. 2019). Wolf brought this action pursuant to Section 20, not Section 15 of The Illinois Whistleblower Act. (ECF No. 35, 2nd Am. Comp. ¶ 66.) Section 20 prohibits an employer from retaliating "against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20.

2

A reasonable jury could find that Wolf refused Medaglia's instruction to provide a no-bid contract to then-Speaker Michael Madigan's son Andrew Madigan's Mesirow Group team in an apparent pay-to-play exchange of support for unprecedented state funding for the business relationship in violation of 720 ILCS 5/33-1, instead considering them among three brokers. (Pls. Resp. Def.'s SOF 28, 35, 38, 43; Pl. SOF 14, 15.) It is both a Class 2 felony to attempt to influence the performance of a public officer by promising or tendering unauthorized property or personal advantage or to "solicit[], receive[], retain[], or agree[] to accept any property or personal advantage pursuant to an understanding that he or she shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer." 720 ILCS 5/33-1(a), (e). Similar schemes were being federally investigated around the time Wolf initiated an RFP and are included in Speaker Madigan's indictment. (Pl. SOF 15, 25.) This is far from refusing a "poor business practice" like that found insufficient in *Sardiga v. N. Tr. Co.,* 948 N.E.2d 652, 658-59 (Ill. App. Ct. 2011), to which SAH cites (at 7). And Wolf's RFP goes beyond merely protesting "potentially illegal actions through internal" or nongovernmental channels like in the other two cases SAH cites. *Montoya v. Atkore Int'l, Inc*., No. 17 C 3628, 2018 U.S. Dist. LEXIS 177428, *11; 2018 WL 5013565 (N.D. Ill. Oct. 16, 2018); *see also Pignato v. Givaudan Flavors Corp.,* No. 11 C 7090, 2013 U.S. Dist. LEXIS 34431, *13-14; 2013 WL 995157 (N.D. Ill. Mar. 13, 2013).

It would not have been the regular or expected practice for a VP to undergo an RFP where, as was the case here, SAH had still-existing contract with their vendor. (Pl. Resp. to Def. SOF 36; Pl. SOF 14.) The contention that Medaglia expected Wolf to engage in an RFP rather than awarding the business to Andrew Madigan is undermined by the unusual step Medaglia took in setting up an in-person meeting between Wolf and Madigan (and no other potential vendors) and other

3

involvement in Madigan's proposal. (Pl. SOF 13.) And Medaglia testified that he did not instruct Wolf to undergo an RFP Process. (Pl. Resp. to Def. SOF 36.)

Although it does not appear that Medaglia tried to overrule Wolf's decision to stick with their current broker after Wolf completed the RFP review Medaglia testified that Wolf had the sole authority to make the decision about brokers, not him, and that Wolf had done a "very good job" supporting her choice. (Pl. Resp. to Def. SOF 37.) Medaglia overriding Wolf's decision would have been untenable at that point. And Medaglia reacted to Wolf's well-documented refusal to award the business to Andrew Madigan, by immediately asking SAH's Speaker Madigan-connected lobbyists—Victor Reyes and Mike Noonan of Roosevelt Group—to create a proactive plan in case the hospital faced any political retaliation for the decision. (Def. SOF 40; Pl. SOF 5, 24.) In fact, the Mesirow Group, and Andrew Madigan in particular, were infuriated by Wolf's decision as she documented; they certainly seemed to think the business was a sure thing. (Pl. SOF 20.) A reasonable jury can conclude that Madigan's apparent belief was based in their expectation that SAH would *not* have conducted an RFP and instead simply awarded them the business. It would be contrary to public policy for an employee to loose protection under the Whistleblower Act simply because her refusal to participate in illegal activities successfully thwarted the plan.

B. **Wolf May Also Pursue Her Retaliatory Discharge Claim Based on Her Refusal to Participate in What She Believed in Good Faith to Be a Criminal Act**.

Even if SAH would not have violated state law by hiring Andrew Madigan's team, Wolf may pursue a common law claim based on her good faith belief that it would have. As SAH notes (at 5-6), an employee may pursue a retaliatory discharge claim where her employer fired her for refusing to engage in illegal conduct as "[t]here is no public policy more basic, and nothing more implicit in the concept of ordered liberty, than the enforcement of the state's criminal code." *King v. Senior Servs. Assocs.*, 792 N.E.2d 412, 415 (Ill. App. Ct. 2003); *see e.g. Blount v. Stroud,* 904 N.E.2d

4

1, 11-12 (Ill. 2009); *Wheeler v. Caterpillar Tractor Co.*, 485 N.E.2d 372 (Ill. 1985); *Russ v. Pension Consultants Co.*, 538 N.E.2d 693 (1st Dist. 1989). Unlike refusals under the Whistleblower Act, the employee need only prove she had a good faith belief of illegality. *Palmateer v. Int'l Harvester Co.,* 421 N.E.2d 876, 880 (Ill. 1981); *see also Tejack v. Quality Terminal Servs., LLC,* No. 99 C 3083, 2000 U.S. Dist. LEXIS 16788, at *14-15, 2000 WL 1720435 (N.D. Ill. Nov. 13, 2000) (denying summary judgment where court found sufficient evidence to lead truck driver to reasonably believe that coworker was intoxicated and therefore refuse to work with impaired worker); *Webber v. Wight & Co.*, 858 N.E.2d 579, 595 (Ill. Ct. App. 1st Dist. 2006) (affirming decision allowing testimony on good-faith belief that employer's conduct had been illegal).

Wolf certainly had a good faith belief that contracting with Madigan's team would have violated anti-bribery laws. SAH had a history of politically connected, unbudgeted hirings "if they can provide a rate of return," and expressly chose their lobbyists in Springfield, Mike Noonan and Victor Reyes of Roosevelt Group, because of their clout. (Pl. SOF 4-7.) Reyes contacted Medaglia to request he meet with Andrew Madigan about switching the hospital's insurance contract to him at Mesirow Group, which Madigan did to see if doing business with "the speaker of the House's son "could bring value" given the Hospital's previous refusal to do so had apparently angered Speaker Madigan. (Pl. SOF 12.) Medaglia believed that if he "wasn't in good graces with Speaker Madigan…he was not going to be supportive of anything [such as]… funding for the hospital. (Pl. SOF 12.) Andrew Madigan contacted Medaglia directly in March 2019 to discuss the potential switch, despite Madigan's knowledge from 2018 of the Hospital's service contract with their current broker and that Wolf was the proper contact for such inquiries. (Pl. SOF 10.) Even though Medaglia was not generally involved in the employee benefit vendor process, Medaglia set up an in-person meeting between Wolf and Madigan, but no other potential brokers. (Pl SOF 13-14.) Wolf testified

5

that Medaglia told her the brokerage deal was pay-to-play. (Pl. SOF. 14.) SAH then received a $5,500,000 non-competitive grant from the Illinois Department of Public Health for FY2019. (Pl. SOF 9.) Although the IDPH had no record of the Hospital having filed a grant application that summer, SAH was one of just 8 hospitals to receive a non-competitive FY20 Hospital Health Protection Grant and one of just three to receive $5,500,000 for "ordinary and contingent expenses pursuant to Public Act 101-007." (Pl. SOF 16.) The FY20 and FY19 grants were the largest state grants received by SAH since 2012. (Pl. SOF 17.) Medaglia denied being involved in the state grant application process other than signing the agreements but was actively involved in the FY20 Hospital Grant, instructing his Chief Financial Officer to "hit them from all sides." (Pl. SOF 18.) After Wolf began collecting proposals, Mesirow Group acted uncooperative and entitled. (Pl. SOF 19.) Medaglia then met with Speaker Madigan's Office, who Medaglia testified previously "never wanted to look at [him]. He never wanted to hear [his] name," after which Medaglia called Wolf in anger saying that Speaker Madigan was upset with the Hospital for not "playing ball" and then blamed Wolf at the next leadership team meeting for the likelihood that SAH not receive their extended state funding. (Pl. SOF 12, 20-21.) Even Medaglia was not surprised that outlets had already reported that Speaker Madigan did favors for Chicagoland towns around the same times that the suburbs and hired Andrew Madigan, so SAH should not be surprised that a reasonable jury could find Wolf had a good-faith belief that SAH intended to break the law by awarding the business to Andrew Madigan in exchange for state funding. (Pl. SOF 11.)

### C. In Addition to Her Termination, SAH's Retaliatory Campaign and Denial of Wolf's Pay Raise Constitute Adverse Actions under the Whistleblower Act.

SAH concedes that Wolf's termination constitutes an adverse action for both her Whistleblower Act and retaliatory discharge claim. (Mem. at 8-9.) As SAH notes (at 9), the Whistleblower Act also protects employees from any material employer action that would dissuade

6

a reasonable employee from engaging in protected activity. *Harris v. City of Chi.*, 479 F. Supp. 3d 743, 751 (N.D. Ill. 2020). "[T]he alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). Reasonable employees would be dissuaded from protected conduct if they knew they'd lose out on their merit increase for the following year, be subjected to extraordinary, sham investigation into their demeanor, undermined in their position, and targeted for ultimate termination. (Pl. SOF 27-8; Pl. Resp. to Def. SOF 46, 57, 62.) *C.f. Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) (describing the "typical sham investigation" as "deliberately failing to interview certain witnesses"). Separately the denial of the raise itself constitutes an adverse action. *Hunt v. City of Markham,* 219 F.3d 649, 654 (7th Cir. 2000). While Plaintiff offered Medaglia to redirect her raise to her team (Def. SOF 56), Plaintiff disputes the reasons for Medaglia's decision not to award Wolf a merit increase while doing so for the rest of the executive team in a period of financial trouble. As Wolf testified, "[n]ot only did he not share them with my people, he didn't give me one." (Pl. Resp. to Def. SOF 57.)

### D. SAH Took Advantage of its RIF to Hide Wolf's Retaliatory Discharge But There Is No Evidence Supporting Wolf's Inclusion in the RIF.

A reasonable jury could conclude that Wolf was terminated because she refused to participate in the apparent pay-to-play scheme rather than because of the RIF. The external investigation into Wolf's demeanor found no cause for termination (Pl. Resp. to Def. SOF 53), so the RIF represented the Hospital's first real opportunity to fire Wolf. *See Baines v. Walgreen Co.,* 863 F.3d 656, 666 (7th Cir. 2017) (reversing summary judgment where time gap between protected activity and adverse action was understandable as this was employer's "first opportunity to retaliate"). The Ninth Circuit reversed summary judgment for an employer in similar circumstances. *Davis v. Team Elec. Co*., 520 F.3d 1080 (9th Cir. 2008). The employer in *Davis* asserted plaintiff "was laid off, with sixteen other

7

employees, for economic reasons" but conceded that "there is no evidence in the record as to why Davis in particular was laid off." *Id.* at 1094. As the court explained, "it is not enough for an employer to simply state that it decided to lay off a group of workers. To meet its burden, the employer must explain why it selected the plaintiff in particular for the layoff. To impose a lesser standard would allow an employer with only the slightest amount of guile to get away with retaliation simply by laying off a victim of discrimination at the same time it laid off other workers for legitimate reasons." *Id.* Like the employer in *Davis*, SAH concedes there is **no** evidence in the record as to why Wolf in particular was included in the RIF. (Pl. SOF 33, 38.) This is particularly concerning considering Medaglia agrees Wolf was meeting SAH's reasonable expectations. (Pl. SOF 3.) Accordingly *Bourbon v. Kmart Corp.*, 223 F.3d 469, 473 (7th Cir. 2000), *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 693 (7th Cir. 2006), and *Michas v. Health Costs Controls of Ill., Inc.*, 209 F.3d 687, 694-695 (7th Cir. 2000) (cited at Mem. at 10) are easily distinguishable. Moreover, SAH broke from its own RIF procedures when it included Wolf in the RIF without a productivity analysis and on a different date than those who were genuinely included. (Pl. SOF 34-36.) *See Bingham v. Raytheon Tech. Servs. Co.*, LLC, No. 1:13-cv-00211-TWP-DKL, 2014 U.S. Dist. LEXIS 154915, at *13-14 (S.D. Ind. Oct. 31, 2014).

## II. GENUINE ISSUES OF DISPUTED MATERIAL FACTS PRECLUDE SUMMARY JUDGMENT ON WOLF'S FMLA CLAIMS

SAH violated FMLA when it fired world during her protected leave despite four years of meritorious service purportedly as part of RIF. FMLA prohibits employers from interfering with and retaliating against an employee's use or attempted use of up to 12 weeks of protected leave to address their or a family member's serious medical condition. 29 U.S.C. § 2612(a)(1)(A); *Guzman v. Brown Cty.*, 884 F.3d 633, 638 (7th Cir. 2018). "The difference between the two theories is that a retaliation claim requires the employee to prove discriminatory or retaliatory intent while an interference claim

only requires the employee to prove that the employer denied him entitlements provided by the Act." *Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012). Wolf alleges both theories of liability.

### A. Wolf May Proceed on Her Interference Claim Where SAH's Violation of her Protected Leave Caused Her Damages.

Upon the employee's return from protected leave, the FMLA requires employers to restore eligible employees who take a protected leave "to the position of employment held by the employee when leave commenced; or "to an equivalent position." 29 U.S.C § 2614(a)(1). "An employee is entitled to such reinstatement even if the employee has been replaced or . . . her position has been restructured to accommodate the employee's absence." 29 C.F.R. § 825.214. SAH's "intent is immaterial." *See King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). To state a claim for improper interference, an employee need only show that her employer deprived her of an FMLA entitlement. 29 U.S.C. § 2615(a)(1), *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006).

SAH does not contest that Wolf was an eligible employee under the FMLA, that the Hospital is covered by the FMLA, or that Wolf was entitled to FMLA leave. Nor does SAH contest that Wolf took an approved FMLA leave starting March 30, 2020, which would have expired June 22, 2020, had she not already been terminated. (Def. SOF ¶¶ 63-6; Pl. SOF 38.) "The only issue is whether the defendants fired her to prevent her from exercising her right to reinstatement to her position." *Goelzer v. Sheboygan Cty.,* 604 F.3d 987, 993 (7th Cir. 2010). *See also Alton v. SmithGroup, Inc.*, No. 18-cv-4229, 2019 U.S. Dist. LEXIS 172210, *5 (N.D. Ill. Oct. 3, 2019) (denying summary judgment where plaintiff raised a triable fact that employer's reason for including employee in a RIF was false); *Sorah v. New Horizons Home Healthcare L.L.C.*, No. 1:16-CV-291-TLS, 2018 U.S. Dist. LEXIS 190196, *12-13 (N.D. Ind. Nov. 7, 2018) (denying summary judgment on FMLA interference claim where employer failed to reinstate employee after protected leave).

9

In the context of a layoff or RIF, "[a]n employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration." 29 C.F.R. § 825.216(a)(1). SAH has consistently maintained Wolf's position had been eliminated as part of a RIF. (Pl. SOF 38.) But even though there seems to be agreement that documenting RIF decisions is important and normal (Pl. SOF 33), SAH has produced no documents supporting Wolf's inclusion in the RIF let alone that Wolf's position had been selected prior to her taking protected leave. *C.f. Ilhardt v. Sara Lee Corp.,* 118 F.3d 1151, 1155, 1157 (7th Cir. 1997). The few documents related to the RIF undermine Wolf's layoff absent her FMLA leave. For one, Wolf is listed as terminated as a part of the "reorganization" that occurred on May 26, 2020, but was the only one not notified of her termination until June. (Pl. SOF 36-38.) Nor is she listed on a list of those from the HR department who would be selected for the RIF. (Pl. SOF 36.)

The position elimination explanation is a pretext for the FMLA violation. As Medaglia noted in hiring Wolf, the "position being offered to you is critical to assuring the hospital's future." (Pl. SOF 2.) Moreover, Medaglia states that "[t]he positions that have been eliminate[d] were selected based on a decrease in productivity and a minimum value to SAH during this pandemic," but SAH has produced no documents demonstrating that these criteria apply to Wolf. (Pl. SOF 2.) Medaglia did not ask Maria Garcia, who ultimately took over for Wolf upon her termination as head of HR, for any productivity or value information before selecting Wolf for termination. (Pl. SOF 34.) On the contrary, the documents and testimony demonstrate that Wolf and her entire team were working extended hours during the pandemic to update human resources policies such as those related to work-from-home and call-offs. (Pl. SOF 29.)

SAH argues only that Wolf wouldn't have had a right to reinstatement if she could not have returned to work *after* her twelve weeks of leave elapsed. (Mem. at 12-13.) In support of their

10

argument, SAH cites only *James v. Hyatt Regency Chicago,* 707 F.3d 775, 780-781 (7th Cir. 2013) and *Franzen v. Ellis Corporation*, 543 F.3d 420, 426 (7th Cir. 2008). *James* stands for the uncontroversial proposition that FMLA does not obligate employers to reinstate an employee who is unable to perform the essential functions of his job. 707 F.3d at 781. And *Franzen* affirmed the denial of damages to an employee after a jury found his employer *had* violated the FMLA by terminating the employee during his leave because the employee failed to mitigate his damages by never seeking alternative employment upon termination. 543 F.3d at 430. Notably, the district court had denied the employer's motion for summary judgment on the employee's FMLA claims. *Franzen v. Ellis Corp.,* No. 03 C 0641, 2005 U.S. Dist. LEXIS 7196, at **12-15 (N.D. Ill. Mar. 24, 2005).

Both are inapposite because Wolf was terminated *during* her protected leave and properly attempted to mitigate her damages. (Pl. SOF 39.) In *Cloutier v. GoJet Airlines, LLC*, 311 F. Supp. 3d 928, 942-43 (N.D. Ill. 2018), for example, the district court denied summary judgment on a former employee's FMLA interference claim over his former employer's identical argument, distinguishing both *James* and *Franzen*. As that court noted, "[t]hough it may be true that the FMLA does not require [an employer] to reinstate [any employee] after the expiration of his twelve weeks of FMLA leave, the cases that [employer] cites do not support the proposition that [the employee's] inability to return to his job by [the expiration of his protected leave] retroactively stripped him of the FMLA protections to which he was entitled for those first twelve weeks." *Id.* at 942. Thereafter, a jury found in favor of the employee. *Cloutier v. GoJet Airlines, LLC*, 357 F. Supp. 3d 675, 679 (N.D. Ill. 2019).

Unlike the plaintiff in *James*, Wolf was never given the opportunity to return to work at the end of her leave so her doctor would not have had reason to provide a certification. In fact, in *James* the employer had "attempted on multiple occasions to return [the employee] to work." 707 F.3d at 782. In contrast, SAH never encouraged her to return to work and terminated her during her allowed

11

leave. (Pl. SOF 37.) Wolf's only option when terminated during her leave was to continue with the disability insurance process in order to mitigate her damages associated with the refusal to reinstate her. *C.f. Franzen,* 543 F.3d at 429-30 (emphasizing the requirement that an FMLA plaintiff attempt to mitigate their damages). SAH should not be permitted to benefit from Wolf's responsible actions. Moreover, unlike *Franzen* where the employee certified that he could not work in any profession again and then indeed did not again work after his unlawful termination, Wolf did return to work, albeit at a lower compensation level as a result of SAH's unlawful actions. (Pl. SOF 40.) Accordingly, summary judgment on Wolf's interference claim is inappropriate. *See Katz v. Nw. Orthopaedics & Sports Med. Ltd.*, No. 18 CV 4515, 2020 U.S. Dist. LEXIS 73225, at *17-18 (N.D. Ill. Apr. 27, 2020) (Shah) (denying summary judgment on plaintiff's FMLA interference claim, under the theory that employer violated her right to be reinstated when it terminated plaintiff's role due to "restructuring" while plaintiff was on leave).

**B. Wolf Presents Genuine Disputes of Material Fact About FMLA Retaliation.**

Wolf presents sufficient facts to proceed with her retaliation claim under 29 U.S.C. § 2615(a)(2). An FMLA plaintiff must adduce evidence that "(1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel,* 695 F.3d at 631. There is no dispute that Wolf took protected medical leave that was approved to run from March 30, 2020 - June 22, 2020. (Def. SOF ¶¶ 63-64.) It is further undisputed that SAH terminated her *during* her approved FMLA leave instead of reinstating her to her previous position. (Pl. SOF 38, Pl. Resp. to Def. SOF 64.) *See Ammons v. Chi. Bd. of Educ.*, No. 16-cv-4884, 2018 U.S. Dist. LEXIS 162715, at *47 (N.D. Ill. Sep. 24, 2018) (denying summary judgment on FMLA retaliation claim where "Plaintiff was on (or had very recently returned from) leave" when the adverse action occurred).

12

Contrary to SAH's assertion (Mem. at 15), a reasonable jury could find a causal link between that protected activity and the termination. "To succeed on a retaliation claim the plaintiff does not need to prove that retaliation was the only reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer,* 604 F.3d at 995 (internal quotation marks omitted); *see also Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014). Before her leave, Wolf was indispensable. Medaglia even wanted to offer her a retention bonus. (Pl. SOF 28.) He tried to deny her PTO because HR was so understaffed. (Pl. SOF 28.) Then SAH underwent its RIF—which did not initially include Wolf—in which it laid off employees due to their lowered "productivity." (Pl. SOF 34.) Obviously, with Wolf out on FMLA leave she was not productive, and the Hospital's reliance on such a factor is direct evidence of FMLA retaliation. *See Pagel,* 695 F.3d at 629 (reversing summary judgment for employer; noting FMLA "can require that performance standards be adjusted to avoid penalizing an employee for being absent during FMLA-protected leave"); *Sorah*, 2018 U.S. Dist. LEXIS 190196, at *8 (denying summary judgment on FMLA retaliation claim where employer noted that plaintiff had been on extended leave and the "position needed to be taken care of"). Furthermore, the absence of documentation supporting Wolf's lack of productivity (other than being on FMLA leave) and value during the pandemic will also be used to show pretext. (Pl. SOF 33-34.) *See Goelzer*, 604 F.3d at 995 (reversing summary judgment on employee's FMLA interference and retaliation claims noting there were "no documents evidencing a plan to restructure" employees position); *Malin*, 762 F.3d at 563-64 (reversing summary judgment on FMLA retaliation claim where there was no evidence that Plaintiff would have been demoted during reorganization prior to her taking protected leave); *cf. Douyon v. N.Y. City Dep't of Educ.*, 665 Fed. Appx. 54, 58 (2d Cir. 2016) (finding no pretext because "the record is clear that [the plaintiff] lost her job as a result of a pre-planned,

13

organization-wide change"). And the termination letter repeatedly references Wolf's leave. (Pl. SOF 38.) *See Cloutier*, 311 F. Supp. 3d at 944 (denying summary judgment on retaliation claim where decisionmaker's email expressed his intent to fire plaintiff after his FMLA leave ended).

As further evidence of pretext, the Hospital falsely asserted that Wolf's as Head of HR was "eliminated." (Pl. SOF 38.) Although she had a different title, Maria Garcia was tasked with the majority of Wolf's former duties including heading HR. (Pl. SOF 39.) *See Smith v. Univ. of Chi. Hosps.*, No. 02 C 0221, 2003 U.S. Dist. LEXIS 20965, at *36 (N.D. Ill. Nov. 20, 2003) (denying summary judgment on FMLA retaliation claim where plaintiff disputed defendant's assertion that her position had actually been eliminated in RIF).

Like it did with Wolf's interference claim, SAH argues that Wolf was unprotected by the FMLA because she may have requested a reasonable accommodation had she not been fired during her protected leave. (Mem. 13-14.) But *every* case to which SAH cites relates to whether an employee has a tenable FMLA retaliation claim for an employer's actions during *unprotected* leave, that is leave beyond the 12 weeks required by FMLA. *Breneisen v. Motorola, Inc.*, 656 F.3d 701, 705 (7th Cir. 2011) ("There seems to be no dispute that Motorola fully complied with the requirements of the FMLA during and immediately following Breneisen's first leave…..the retaliatory conduct which Breneisen alleges occurred happened when he was no longer subject to the FMLA's clearly defined protections"); *Mims v. Boeing Co.*, No. 18-cv-00264, 2022 U.S. Dist. LEXIS 113930, at *6-7 (N.D. Ill. June 28, 2022) ("Mims alleges that he took two years of leave in addition to his FMLA leave for anxiety and depression, meaning that he was unable to return to work after the end of the statutory period. The FMLA thus does not protect him."); *Gomez v. Dynamic Mfg.*, No. 12-cv-7396, 2013 U.S. Dist. LEXIS 90641, at *6 (N.D. Ill. June 27, 2013) ("When his 12-week leave ended on May 15, 2012, Gomez was no longer subject to the FMLA's protections, and Dynamic was not legally

14

obligated to restore him to his former position. Therefore, Gomez cannot state a claim for either FMLA interference or retaliation."); *LaPorte v. Bureau Veritas N. Am., Inc.*, No. 12 C 9543, 2015 U.S. Dist. LEXIS 11524, at **29, 33-34 (N.D. Ill. Jan. 30, 2015) (plaintiff could not state an FMLA retaliation claim based on termination that occurred months after his leave had expired); *Scheidt v. Floor Covering Assocs.*, No. 16-cv-5999, 2018 U.S. Dist. LEXIS 167480, at *35 (N.D. Ill. Sep. 28, 2018) (plaintiff "already had used the entirety of the leave to which she was entitled under the FMLA when her employment was terminated"); *Pontolillo v. St. Vincent Health, Inc.*, No. 1:06-cv-1509-WTL-TAB, 2009 U.S. Dist. LEXIS 29756, at *34 (S.D. Ind. Feb. 4, 2009) (plaintiff claimed retaliation occurred when her employer failed to reinstate her previous position when she tried to return to work a month after her FMLA expired). These cases "do not support the proposition that [Wolf's purported] inability to return to her job by June 22, 2020, retroactively stripped [her] of the FMLA protections to which [s]he was entitled for those first twelve weeks." *Cloutier*, 311 F. Supp. 3d at 942. Like the plaintiff in *Cloutier,* SAH fired Wolf *during* her protected leave. *Id.* at 943. Accordingly, summary judgment is similarly unwarranted. *Id.* at 944.

      Nor does SAH's reliance on *Franzen,* yield a different result. Unlike the plaintiff in *Franzen*, who went on Social Security disability and never worked after his former employer violated his FMLA rights, Wolf *has* properly mitigated her damages by taking another position that pays her substantially less than what she would have been earning at SAH absent their unlawful action. (Pl. SOF 40.) 543 F.3d at 429-30. She is not seeking compensation for periods in which, absent the unlawful action, she still would have been unable to work. Because Wolf has provided evidence of damages resulting from SAH's FMLA retaliation, summary judgment is inappropriate.

## Conclusion

15

Because SAH has failed to demonstrate a lack of genuine issues of material fact, summary judgment is inappropriate.

Dated:  February 21, 2023	Respectfully submitted,
	**STELLA SOSA WOLF**
	Plaintiff,

	BY: /s/ *Gail S. Eisenberg*
	      One of Her Attorneys

Gail S. Eisenberg, Esq.
Alexander Loftus, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark St., Suite 1600
Chicago, IL 60601
Phone: 312-899-6625
Gail@LoftusandEisenberg.com
Alex@LoftusandEisenberg.com

CERTIFICATE OF SERVICE

I, the undersigned, being first duly sworn upon oath, depose, and say that I caused to be served the foregoing document by electronically filing the same with the Clerk for the U.S. District Court for the Northern District of Illinois, Eastern Division, a copy of which was then forwarded to each attorney of record by CM/ECF on February 21, 2023.

                                        *s/ Gail S. Eisenberg*

                                        Gail S. Eisenberg
                                        LOFTUS & EISENBERG LTD.
                                        161 N. Clark St., Suite 1600
                                        Chicago, IL 60601
                                        Phone: 312-899-6625
                                        GEisenberg@LoftusandEisenberg.com