UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STELLA SOSA WOLF,

          Plaintiff,

     v.

ST. ANTHONY HOSPITAL,

          Defendant.

No. 21 CV 3273

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiff Stella Wolf worked for St. Anthony Hospital as its Chief Human Resources Officer for four years. Wolf alleges that the Hospital retaliated against her for challenging alleged political corruption and for taking medical leave. Wolf brings whistleblower claims under the Illinois Whistleblower Act and Illinois common law, as well as interference and retaliation claims under the Family and Medical Leave Act. The Hospital moves for summary judgment. For the reasons below, the Hospital's motion is granted.

## I.    Legal Standard

Summary judgment is warranted if there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "'Material facts' are facts that 'might affect the outcome of the suit,' and a dispute as to those facts is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hunter v. Museke*, 73 F.4th 561, 565 (7th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court need consider only the cited materials, but it may consider other materials in the

record. Fed. R. Civ. P. 56(c)(3). The non-moving party is given "the benefit of conflicting evidence and any favorable inferences that are reasonably drawn from the evidence." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022).

## II. Facts

Saint Anthony Hospital is an independent, nonprofit, faith-based community hospital dedicated to improving the health and wellness of families on the West Side and Southwest Side of Chicago. [58] ¶ 4.[1] The Hospital had a history of financial distress, since at least 2019. [63] ¶ 7. Wolf was its Chief Human Resources Officer and Vice President, Human Resources, from 2016–2020. [58] ¶ 5; [63] ¶ 1. Wolf's direct supervisor was Chief Executive Officer Guy Medaglia. [58] ¶ 6; [63] ¶ 1. Among others, Wolf directly supervised the Human Resources Director. [58] ¶ 7.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. When a document has numbered paragraphs, I cite to the paragraph, for example [1] ¶ 1. The facts are largely taken from Wolf's response to defendant's Local Rule 56.1 statement, [58], and defendant's response to Wolf's 56.1 statement of additional facts, [63], where both the asserted fact and the opposing party's response are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard all immaterial facts. *See* [58] 58] ¶¶ 10, 12, 17, 19, 22, 41, 47, 58–62, 66; [63] ¶¶ 7–8, 19, 30–31, 37, 40. I ignore additional facts included in responses that do not controvert the asserted fact. *See* [58] ¶¶ 14, 29–30, 46. I also ignore all facts included in statements or responses that are not supported by the parties' cited evidence. N.D. Ill. Local R. 56.1(d)(2), (e)(3); *see* [58] ¶¶ 27, 33, 36, 38, 67, 74, 77, 78; [63] ¶¶ 9, 13, 16, 17, 18, 20, 23, 27, 28, 33. General objections to how facts are characterized, *see* [58] ¶¶ 25, 35, 40, 43, 69, *and* [63] ¶¶ 14, 21, 26, are sustained and I omit the characterizations and cite to the original language when possible. The Hospital's objections to Wolf's inclusion of multiple newspaper articles as unauthenticated and inadmissible hearsay are also sustained. *See* [63] ¶¶ 5, 11, 25. While newspaper articles are self-authenticating, Fed. R. Evid. 902(6), they are inadmissible hearsay when they are offered for the truth of the matters asserted therein, *see* Fed. R. Evid. 801(c); *Chi. Firefighters Local 2 v. City of Chicago*, 249 F.3d 649, 654 (7th Cir. 2001). Wolf makes no argument that she is not offering the articles for any other purpose. Where the parties dispute facts and both rely on admissible evidence, I set forth all the facts. *See* [58] ¶¶ 37, 49, 53, 64, 57, 73, 76; [63] ¶ 2, 6, 12, 36.

When hiring Wolf, Medaglia considered Wolf's position "critical in assuring the hospital's future" and noted that Wolf could bring the "strong leadership" necessary to bring the HR department up to snuff. [63] ¶ 2. Wolf performed her job well, although her performance reviews or other metrics are missing from her personnel file, and she never received any warnings about her productivity or any other part of her performance. [63] ¶ 3; *but see* [58] ¶ 53 *and below at* p. 6–7.

### A.    Review of Insurance Broker

The Human Resources department would annually do their due diligence regarding employee benefits, report to the executive committee, and conduct a Request for Proposal to ensure that the Hospital had the best insurance contract available. [58] ¶ 27. Medaglia testified that he was not involved in any way with the employee-benefit vendor process. [63] ¶ 13.

One of the Hospital's lobbyists contacted Medaglia and asked him to meet with Andrew Madigan about switching its insurance brokerage. [63] ¶ 12. Andrew Madigan was a broker at Alliant/Mesirow Insurance Services and is related to former Speaker of the Illinois House Michael Madigan. [58] ¶ 28.

In 2018, Medaglia asked Wolf to prepare and give the Hospital's healthcare data to Andrew Madigan so that he could "throw his hat in the ring for the brokerage business." [58] ¶¶ 29–30. It was not uncommon for the Hospital to give data of their current insurance company to a competitor so that the competitor could try to make a competitive bid. [58] ¶ 26. Medaglia's assistant arranged a meeting between Andrew Madigan and Wolf. [63] ¶ 14. Medaglia did not set up other meetings with potential brokers. *Id.*

Andrew Madigan had previously pitched the Hospital, which hadn't hired him. [63] ¶ 12. Medaglia believed this angered Speaker Madigan: "I upset his father a lot to the point where I was told by our lobbyist that he never wanted to look at me. He never wanted to hear my name. So, you know, I guess not hiring, you know, it had some issues." *Id.* "[T]he way I interpreted it was I wasn't in good graces with Speaker Madigan and that he was not going to be supportive of anything ... funding for the hospital." *Id.*

Wolf opposed meeting with Mesirow Group at the time because the Hospital's insurance broker contract did not expire for another year and a half. [58] ¶ 31. Ultimately, Wolf provided Mesirow Group with the insurance data and met with it in 2018. [58] ¶ 32. Aside from complaining that the 2018 meeting was taking place too far in advance of the contract ending for the shared data to be accurate, Wolf did not voice any objections about the meeting, and she did not report any concern of political corruption or a pay-to-play scheme. [58] ¶¶ 33, 43.

Andrew Madigan later contacted Medaglia directly in March 2019 to discuss switching the health insurance brokerage to Mesirow Group. [63] ¶ 10. It was not unusual for vendors to reach out to Medaglia directly in this way. *Id.*

In 2019, Wolf had no problem sharing data with Mesirow Group and meeting them again, because the Hospital's benefits vendor contract was closer to the renewal stage. [58] ¶ 34. While Medaglia did not specifically instruct Wolf to issue a formal Request For Proposal, he regularly instructed all his Vice Presidents to get multiple competitive bids anytime they were researching services, providers, or other deals,

and vetting prices against competitors was an expected practice in the organization. [58] ¶ 36. Considering the Hospital's dire financial situation, Wolf used competitive bidding in part to ensure she was getting the best price for the best benefits. [58] ¶ 25.

Wolf was concerned that she was being brought into a potential corruption scheme but was afraid she would be fired if she reported concerns to the Board. [63] ¶ 15. To have cover if she ultimately recommended not awarding the contract to Mesirow Group, Wolf put the contract out to RFP and got three bids. [63] ¶ 15; [58] ¶ 43. Wolf never reported any concerns to the Board or raised any concerns of political corruption to anyone at the Hospital. [58] ¶ 44.

Medaglia could have stopped Wolf from proceeding with the RFP process. [58] ¶ 37. It is unclear if Medaglia was aware that Wolf was conducting an RFP. [58] ¶¶ 35, 37. The HR Director recalled reviewing the Hospital's insurance and considering Mesirow Group as just one option, and that Wolf told her that Medaglia instructed Wolf to pick the best option for the Hospital. [58] ¶ 38.

In mid-2019, Medaglia went to Springfield with the Hospital's Senior Vice President, Mission and Community Development, Jim Sifuentes to meet with Speaker Madigan's office. [63] ¶ 20. Medaglia called Wolf saying that the Speaker was upset with the Hospital for not "playing ball" and for sharing Madigan's proposal or data to the other two bidders, which Wolf explained was not true after checking with her team. *Id.*

The next day Medaglia debriefed the trip to the Hospital's leadership team. [63] ¶ 21. He looked Wolf "straight in the eye and he said, 'We're not going to be

5

getting our $5 million funding because we didn't cooperate, something to that effect … we didn't play ball basically." *Id.* Sifuentes confirmed that Speaker "Madigan was not happy saying that [Medaglia's] head of HR was not cooperating and basically not giving them the insurance brokerage business." **[63] ¶ 21.**

In September 2019, Wolf emailed Medaglia to inform him that she had completed the RFP process, decided to continue working with the current broker and the reasons for that recommendation, and had informed Mesirow Group that it did not get the business. [58] ¶ 39; [63] ¶ 22. Within thirty minutes of Wolf's email, Medaglia emailed Sifuentes to ask that the Hospital's lobbyists create a proactive plan in case it faced political retaliation for this decision. [58] ¶ 40; [63] ¶ 24.

According to Wolf, Mesirow Group appeared frustrated with the decision and Wolf speculated that Andrew Madigan "just assumed he was going to get [the business] because of his name." [63] ¶ 23.

After Wolf recommended not working with Mesirow Group, Wolf and Medaglia never discussed the results of the RFP. [58] ¶ 42. Medaglia had the authority to override Wolf's RFP recommendation, but he did not. *Id.*

## B.    Investigation into Employee Complaint

In November 2019, a former employee filed a complaint alleging that Wolf "ha[d] been condescending and verbally abusive towards employees." [58] ¶ 48. When employees raised complaints about other employees, HR was generally in charge of investigating the complaint and then deciding whether to issue corrective action. [58] ¶ 45. Wolf held the ultimate decision-making authority in this process. *Id.* Because it would have been inappropriate for Wolf's team to run an investigation about her

conduct, no other employees were qualified to do an employee-relations investigation, and it would ensure that there was no appearance of impropriety, the Hospital hired outside counsel to investigate the employee complaint made against Wolf, as well as a complaint against Sifuentes. [58] ¶¶ 46, 49–51; [63] ¶ 27. Wolf contests that there was a need to hire an external investigator as opposed to allowing general counsel to investigate. [58] ¶ 49.

The Hospital gave the investigator the same marching orders for both his investigations into Sifuentes and Wolf: conduct an impartial and independent investigation. [58] ¶ 52.[2] In January 2020, the investigation concluded that Wolf lost her temper and yelled at her employees, that Wolf sometimes used hospital employees to run personal errands, and that Wolf's leadership style contributed to low morale in her department. [58] ¶ 53. The investigation also found that Wolf had not "created a hostile work environment or violated any other federal or state anti-discrimination, harassment or other employment law," that "most employees indicated that her criticism is not personal and always work related," and that "[e]mployees believe that she is effective" such that there would be no "cause" for termination if Wolf had an employment contract requiring cause. *Id.* The investigator told Medaglia that the Hospital could take disciplinary action against Wolf based on the results from his investigation. [58] ¶ 54. The Hospital didn't. [58] ¶ 55.

---

[2] Wolf admits this accurately reflects the investigator's declaration, but now that the Hospital has waived privilege as to the subject matter, Wolf would test the veracity of these statements on cross examination. [58] ¶¶ 52–54.

### C.    Merit Raise

In December 2019, Wolf emailed Medaglia, "Guy, if there are to be any consideration of merit dollars on my behalf (and I presume nothing), I would like to humbly and respectfully request to resource these monies back to our productive and high performing employees. While our hospital is experiencing financial challenges which directly impacts the merit pool … I would like to do my small part to contribute to our deserving employees." [58] ¶ 56. Given the Hospital's financial constraints and the fact that Wolf's own salary was already very competitive while other employees' salaries were below market, Medaglia took Wolf up on her offer. [58] ¶ 57.

### D.    FMLA Leave

Wolf sought FMLA leave in March 2020 for high blood pressure and anxiety. [58] ¶ 63. The leave was approved to start March 27, 2020, and to exhaust twelve weeks later on June 18, 2020. [58] ¶ 64. Medaglia told Wolf's team not to disturb her while she was on leave. [63] ¶ 32. Wolf does not recall if anyone at the Hospital said anything disparaging about her taking FMLA leave. [58] ¶ 69.

Wolf's health condition precluded her being able to return to her job on June 18, 2020. [58] ¶ 65. Wolf testified that after she exhausted her twelve weeks of FMLA leave, she required additional leave before returning to work – "a little but more time … another month or two." [58] ¶ 67. Wolf's medical provider submitted medical documentation in her application for disability benefits showing that Wolf was not medically able to work until September 30, 2020. [58] ¶ 68. Wolf believed this to be an accurate estimate. *Id.*

8

### E. Reduction in Force

The COVID pandemic greatly affected the Hospital's revenue stream and forced it to make decisions regarding a Reduction in Force. [58] ¶ 70. The Hospital was "under water by millions of dollars and had been for several years and … [salary] costs were important." [58] ¶ 71. It was in "such bad financial standing" that there were a couple times it almost didn't make payroll. *Id.*

Senior leadership was tasked with assessing their workforce to determine near-term staffing needs and potential workforce reductions using a standardized process. [63] ¶ 33. According to the HR Director, RIF decisions depended on the situation but typically involved considering the need for that employee's role, the employee's responsibility, the value the employee is adding to the organization, and the savings that the employer would receive by eliminating that position. [58] ¶ 72. It was also considered best practice to keep documents assessing direct reports and stating the rationale for including an employee in a RIF. [63] ¶ 33.

The 2020 RIF eliminated between 19 to 24 employees' positions, including Wolf's position. [58] ¶ 73; [63] ¶ 36. All but three of those eliminated were terminated on May 26, 2020. [63] ¶ 36. According to Medaglia, "[t]he positions that have been eliminate [sic] were selected based on a decrease in productivity and minimum value to [the Hospital] during this pandemic." [63] ¶ 34.

Wolf was the only employee included in the RIF who was terminated in June 2020. [63] ¶ 36. Medaglia decided to include Wolf in the RIF "somewhere around the same period of time with people that were a part of the RIF that occurred" without consulting anyone else at the Hospital. [63] ¶ 35. Wolf was not included in the HR list

9

of those who would be terminated as a part of the May reorganization. *Id.* Medaglia believed that Wolf was not listed on the RIF sheet with the other employees terminated in May because she had "been on leave at that time" and the Hospital did not effectuate her RIF until she exhausted her FMLA leave. [63] ¶ 36.

According to Medaglia, Wolf's position was included in the RIF because the Hospital needed to cut operational costs substantially during the pandemic to stay afloat and believed that the Hospital could eliminate Wolf's position and retain her high executive-level salary. [58] ¶ 74. As HR was a non-clinical department, Medaglia believed that the department could satisfactorily run with oversight by a lower-paying director-level position, and another officer could absorb Wolf's executive duties. [58] ¶ 74. No documents exist showing any financial analysis Medaglia conducted before or during Wolf's leave. [63] ¶ 38.

The Hospital sent Wolf a letter dated June 10, 2020, while she was still on leave, informing her that her employment would terminate effective June 18, 2020, and asserting "[The Hospital] would have eliminated [Wolf's] position even if [she] had not taken FMLA leave." *Id.* The letter explained that "as [Wolf was] currently on FMLA" her separation date would be June 18, 2020. *Id.*

The Hospital did not hire another employee with the title of Vice President of Human Resources/Chief Human Resources Office for two years after firing Wolf. [58] ¶¶ 76, 78. The RIF-related reorganization put HR under the Legal Department. [58] ¶ 76. Medaglia had existing staff perform Wolf's duties. *Id.* The general counsel oversaw the Department, and a lesser-paying, non-Officer position took over direct

supervision of HR. *Id.*; [63] ¶ 39. The new HR director did not take part in any executive functions that Wolf had in her role, such as attending executive leadership meetings or participating in high-level strategy discussions. [58] ¶ 77.

### F. The Hospital's Political Involvement

Wolf's whistleblowing claims are predicated on the Hospital's political connections, which she claims involved pay-to-play deals, politically motivated hirings, lobbying, and grants. The parties proffer the following facts related to the Hospital's political activities:

- Wolf recalled having a conversation with Medaglia sometime in 2017 or 2018 in which Medaglia said, "You haven't been in Chicago in five years. You're coming from Dallas, but here in the city and us being a nonprofit hospital, there are things sometimes we have to do, and it's called pay-to-play. And in order for us to get funding there are—sometimes we have to do favors for one another." [64] ¶ 14.

- Looking "at the landscape of the political world in Springfield," the Hospital chose lobbyists "better aligned with the elected officials ... given what they have to do or what they have at hand." [63] ¶ 5.

- Sifuentes was close friends with the late Senator Martin Sandoval. [58] ¶ 13. Senator Sandoval represented the constituents around the Hospital and part of his job was to advocate for state funding for the Hospital. [58] ¶ 14. In 2018 and 2019, Sifuentes recruited Senator Sandoval's daughter and her boyfriend into newly created positions, breaking from the Hospital's usual hiring protocol. [58] ¶¶ 15–16, 18;

11

[63] ¶¶ 4, 6. While the Hospital had a general hiring process, it would deviate from this process to recruit employees given difficulties in hiring and retaining staff. [58] ¶¶ 8–9, 11. Wolf did not express any disagreement or oppose the hiring of Senator Sandoval's daughter or her boyfriend. [58] ¶¶ 20–21, 23–24.

- The Hospital received a $5.5 million grant in FY2019 from the Illinois Department of Public Health. [63] ¶ 9. It was also one of the eight safety net hospitals to receive a FY2020 Hospital Health Protection Grant. [63] ¶ 16. Medaglia denied being involved in the state grant application process for these grants other than signing the agreements. [63] ¶ 18.

## III.   Analysis

### A.   Illinois Whistleblower Act

Wolf brings a claim under Section 20 of the Illinois Whistleblower Act, which prohibits an employer from retaliating "against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20; [35] ¶¶ 63–68. To succeed on a claim under the Whistleblower Act, Wolf must show that (1) she refused to participate in an activity that would result in a violation of an Illinois or federal law, rule, or regulation, and (2) her employer retaliated against her because of her refusal. *Corah v. Bruss Co.*, 2017 IL App (1st) 161030, ¶ 15; *Sardiga v. N. Trust Co.*, 409 Ill.App.3d 56, 61 (1st Dist. 2011).

Wolf argues that "a reasonable jury could find that Wolf refused Medaglia's instruction to provide a no-bid contract to then-Speaker Michael Madigan's son

12

Andrew Madigan's Mesirow Group in an apparent pay-to-play exchange of support for unprecedented state funding." [57] at 3. But she proffers no evidence that would allow a reasonable jury to find in her favor.

First, Wolf offers no evidence that Medaglia asked her to do something illegal. Second, Wolf presents no evidence that she refused such a request. And third, Wolf fails to present evidence that the Hospital retaliated against her because of Wolf's allegedly protected activity.

### 1. Illegal Activity

Wolf characterizes Medaglia's request as an instruction to bribe Speaker Madigan with a no-bid contract to his son in exchange for state funding. [57] at 3. But there is no evidence to support an inference of either side of that quid pro quo. Medaglia set up meetings between Andrew Madigan and Wolf so Madigan could "throw his hat in the ring" and "compete for [the Hospital's] business." [58] ¶¶ 29–30; [63] ¶ 14. Even though Medaglia did not instruct Wolf to complete an RFP, Medaglia regularly instructed all his Vice Presidents to get multiple competitive bids anytime they were researching services, providers, or other deals for the Hospital, and vetting prices against competitors was an expected practice in the organization. [58] ¶ 36. And Wolf used competitive bidding in part to ensure the Hospital was getting the best price for the best benefits. [58] ¶ 25. A no-bid contract cannot be inferred from these facts.

While Medaglia acknowledged that pay-to-play existed and being in Speaker Madigan's good graces was good for the Hospital, [64] ¶¶ 12, 14, Wolf presents no

evidence that Speaker Madigan was going to support state funding for the Hospital if the insurance broker contract was given to his son.

Based on the evidence presented, no jury could find that Medaglia asked Wolf to do something illegal.

### 2.    *Refusal to Participate*

To refuse to participate in an activity, an employee must have been asked to participate in it. *See Sardiga*, 409 Ill.App.3d at 62 (relying on Black's Law Dictionary defintion of "'refusal' as '[t]he denial or rejection of something offered or demanded.'"); *see also Robinson v. Alter Barge Line, Inc.*, 513 F.3d 668, 670 (7th Cir. 2008) (explaining that plaintiff never refused to participate in illegal activity because "he was never invited to" engage in it). Because Wolf was not invited to participate in an illegal activity, Wolf could not have refused.

Even if Medaglia's requests that Wolf give Mesirow Group the Hospital's data and that she meet with Madigan were illegal activities, Wolf only voiced concerns and then relented and did exactly what was asked of her. [58] ¶¶ 31, 32. Wolf claims that she refused to engage in a "pay-to-play" scheme by undergoing an RFP process. [63] ¶ 15. But conducting an RFP was not refusing to follow Medaglia's request— Medaglia only asked Wolf to allow Mesirow Group to throw their hat in the ring and compete for SAH's business. [58] ¶ 30. Conducting an RFP was a regular and expected practice and Medaglia told all the Vice Presidents to vet competitive bids when signing services for the Hospital. [58] ¶ 36.

14

Wolf has demonstrated no genuine issue of material fact as to whether she "refus[ed] to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20.

### 3. Retaliation

Even assuming Medaglia invited Wolf to participate in illegal activity and Wolf's choice to complete an RFP constituted a refusal, Wolf does not present facts that would allow a jury to find a causal link between her alleged refusal and the Hospital's alleged retaliatory actions.

Wolf argues that the Hospital took three retaliatory actions against her. First, Wolf argues that it retaliated against her when it hired outside counsel to investigate a former employee's complaint that Wolf was abusive. [57] at 7. While a "sham investigation" can constitute an adverse employment action, *see Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015), Wolf presents no evidence on which a reasonable juror could find that the Hospital hired outside counsel to investigate the complaint because of Wolf's choice to complete an RFP. Wolf admits, based on her own HR expertise, that best practice would be to conduct an impartial, outside investigation into complaints made against the head of HR. [58] ¶ 49. Further, even when the investigation found serious problems with Wolf's leadership style, the Hospital did not discipline Wolf. [58] ¶¶ 53–55. The investigation therefore was not an adverse employment action.

Second, Wolf argues that Medaglia did not award her a merit increase while doing so for the rest of the executive team in a period of financial trouble. [57] at 7 (citing *Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000)). But Wolf does

not present any evidence that other executives received raises. Wolf also admits that she voluntarily requested that Medaglia redirect any raise she may receive elsewhere in the Hospital given its dire financial status and the fact that several of her peers' salaries were under market standards. [58] ¶¶ 56–57. An employee's voluntary decision cannot constitute an adverse employment action. *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999).

Third, the parties agree that Wolf's termination constitutes an adverse action. [52] at 8–9; [57] at 6. But Wolf presents no evidence on which a reasonable jury can find that her alleged whistleblowing activities caused her inclusion in the RIF. The Hospital needed to cut operating costs and Medaglia felt that the non-clinical HR Department could function without an executive-level leader (Wolf's role) during the pandemic, which provided a significant cost savings. [58] ¶¶ 70–71, 74. Wolf points to no evidence to suggest that Medaglia's motive was instead her alleged whistleblowing. Wolf presents no evidence that she was singled out for adverse treatment, as multiple other employees were included in the RIF. [58] ¶ 73; [63] ¶ 36.

Further, there was a significant nine-month time lapse between Wolf's alleged whistleblowing (the September 2019 RFP) and her June 2020 termination. *See* [58] ¶ 39; [63] ¶ 36. Wolf tries to minimize the significance of the time lapse by claiming that the RIF was the first opportunity to retaliate. [57] at 7. Not so. Wolf could have been disciplined after the external investigation into her leadership style. [58] ¶¶ 53–54. The RIF was not the first opportunity to retaliate, so the nine-month time gap

16

undermines an inference of causation. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966–69 (7th Cir. 2012).

Wolf has failed to raise a genuine issue of material fact that would allow a jury to find in her favor. The Hospital is entitled to summary judgment on the IWA claim.

### B. Retaliatory Discharge

Wolf's retaliatory discharge claim fails for similar reasons. To establish retaliatory discharge, a plaintiff must show (1) she has been discharged, (2) in retaliation for her activities, and (3) the discharge violates a clear mandate of public policy. *Bajalo v. Northwestern University*, 369 Ill.App.3d 576, 580 (1st Dist. 2006) (citing *Zimmerman v. Buchheit of Sparta, Inc.,* 164 Ill.2d 29, 35 (1995)). The parties do not dispute that Wolf was discharged. [63] ¶ 38.

"While there is no precise definition of what constitutes clearly mandated public policy, … retaliatory discharge actions have been allowed … where an employee is discharged in retaliation for the reporting of illegal or improper conduct, otherwise known as 'whistleblowing.'" *Michael v. Precision All. Group, LLC,* 2014 IL 117376, ¶ 30. An employee may pursue a retaliatory discharge claim when she has been fired for her refusal to engage in illegal conduct. *Blount v. Stroud*, 232 Ill. 2d 302, 314 (2009).

Unlike refusals under the Whistleblower Act, an employee need only prove she had a good faith belief of illegality. *Palmateer v. Int'l Harvester Co.*, 85 Ill.2d 124, 132–33 (Ill. 1981); *see also Webber v. Wight & Co.*, 368 Ill.App.3d 1007, 1024–25 (1st Dist. 2006) (holding "plaintiff need only show that he had a good-faith belief that [employer's] conduct was illegal.").

Wolf argues that she had a good faith belief that contracting with Mesirow Group would have violated anti-bribery laws. [57] at 5. Wolf cites to the Hospital's history of politically connected, unbudgeted hirings; its choice of lobbyists; and its receipt of government grants. [57] at 5–6 (citing [63] ¶¶ 4–7, 9, 16, 18). She also raises Medaglia's conversations with her about pay-to-play schemes; as well as Medaglia's trip to Springfield and subsequent conversations about Speaker Madigan's displeasure with the Hospital. [57] at 5–6 (citing [63] ¶¶ 12, 14, 20–21). She also cites to Medaglia's atypical involvement in setting up Wolf's meeting with Andrew Madigan. [57] at 5 (citing [63] ¶¶ 10, 12–14).

But a good faith belief in shady dealings is not the same as a good faith belief in illegality. No jury could conclude that Wolf had a good faith belief that Medaglia directed her to award the contract to Madigan's firm, as opposed to taking a meeting and considering the firm as an option. [58] ¶ 30; [63] ¶ 14. As discussed above, Medaglia set up meetings between Andrew Madigan and Wolf so Madigan could "throw his hat in the ring" and "compete for [the Hospital's] business." [58] ¶ 30; [63] ¶ 14. Wolf herself testified that she interpreted Medaglia to be saying that "[Madigan] wants to be able to bid for [the Hospital's] business." [58] ¶ 30.

Even if Wolf had a good faith belief that contracting with Madigan's team would have violated anti-bribery laws, Wolf offers no evidence upon which a jury could find a causal relationship between her activities and her discharge. *See Dixon Distributing Co. v. Hanover Ins. Co.*, 161 Ill.2d 433, 443 (1994) (requiring plaintiff establish a causal relationship between protected activities and discharge). When

deciding the element of causation, the ultimate issue is the employer's motive in discharging the employee. *Clemons v. Mechanical Devices Co.*, 184 Ill.2d 328, 336 (1998). As discussed above, Wolf proffers no evidence that shows that she was included in the RIF as retaliation for her allegedly protected activities.

The Hospital is entitled to summary judgment on Wolf's retaliatory discharge claim.

### C.    FMLA Interference Claim

The FMLA provides employees up to 12 weeks of unpaid leave when an employee is unable to perform the functions of their position because of a serious health condition. 29 U.S.C. § 2612(a)(1)(D). An employer must not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights. 29 U.S.C. § 2615(a)(1).

To survive summary judgment on an FMLA interference claim, Wolf must show that: (1) she was eligible for the FMLA's protections, (2) the Hospital was covered by the FMLA, (3) she was entitled to take leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) the Hospital denied her FMLA benefits to which she was entitled. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 223 (7th Cir. 2015). The plaintiff carries the burden of proving an FMLA interference claim.[3] *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir.

---

[3] Wolf argues that, in the context of a layoff or RIF, 29 C.F.R. § 825.216(a)(1) establishes "[a]n employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration." [57] at 10. But this regulation does not "alter the normal allocation of burdens of proof at trial." *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir. 2000). The regulation "simply states that

2010) (citing *Darst v. Interstate Brands Corp.,* 512 F.3d 903, 908 (7th Cir. 2008)). "[N]o finding of ill intent is required" to prove FMLA interference; an employee need only show that her employer deprived her of an FMLA entitlement. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006); *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011).

The parties agree that Wolf satisfies the first four elements of this claim. [58] ¶¶ 63–64; [63] ¶ 38. The only remaining material question is whether the Hospital denied Wolf FMLA benefits to which she was entitled when it terminated her position on the last day of her protected leave and did not reinstate her.

Upon an employee's return from protected leave, the FMLA requires employers to restore eligible employees "to the position of employment held by the employee when leave commenced" or "to an equivalent position." 29 U.S.C § 2614(a)(1). "An employee's right to reinstatement is not absolute." *Goelzer*, 604 F.3d at 993. "If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave … and restore the employee cease at the time the employee is laid off." 29 C.F.R. § 825.216(a)(1); *see also Goelzer*, 604 F.3d at 993 ("[A]n employee is not entitled to return to her former position if she would have been fired regardless of whether she took the leave.").

---

'when an 'eligible employee' who was on FMLA leave alleges her employer denied her FMLA right to reinstatement, the employer has an opportunity to demonstrate it would have discharged the employee even if she had not been on FMLA leave.'" *Id.* (quoting *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1354 (11th Cir. 2000)).

When an employee is unable to perform the essential functions of the position because of the continuation of a serious health condition, the employee has no right to restoration to that position or to any another position under the FMLA. 29 C.F.R. § 825.216(c); *James v. Hyatt Regency Chi.*, 707 F.3d 775, 780–781 (7th Cir. 2013) (affirming summary judgment to employer, noting "an employer has no duty under the FMLA to return an employee to his or her position, if that employee cannot perform an essential function of the job."); *Franzen v. Ellis Corp.*, 543 F.3d 420, 426 (7th Cir. 2008) ("An employee also has no right to reinstatement—and, therefore, damages—if, at the end of his twelve-week period of leave, he is either unable or unwilling to perform the essential functions of his job."). An employer's duty to reinstate an employee is triggered once an employee submits a statement from her health care provider which indicates that she may return to work. *James*, 707 F.3d at 780–781.

Wolf argues that she was terminated during her protected leave. [57] at 9, 11. The parties do not dispute that the Hospital provided Wolf with twelve weeks of protected FMLA leave starting on March 27, 2020, and ending on June 18, 2020. [58] ¶ 64.[4] While the Hospital sent a notice of Wolf's inclusion in the RIF approximately one week earlier, Wolf's employment was terminated on the last day of her protected leave, June 18, 2020. [58] ¶ 39. Since Wolf was terminated on her last day of protected

---

[4] Wolf's opposition brief states her leave exhausted on June 22, 2020, [57] at 9, but Wolf's response to the Hospital's Statement of Facts admits that her leave would exhaust on June 18, 2020, [58] ¶ 64.

leave, the only remaining entitlement she potentially had was restoration to her position.

Although Wolf attempts to argue that the Hospital's proffered reason for firing her is pretext, [57] at 10, she fails to demonstrate that she was entitled to reinstatement as a threshold matter: Wolf provides no evidence that she would have been able to return to work after June 18, 2020. Wolf admitted that her health condition precluded returning to her job and testified that she required "another month or two" of time off. [58] ¶¶ 65, 67. Wolf argues that, because she was never given the opportunity to return to work, her doctor had no reason to provide certification. [57] at 11. But as part of her application for disability benefits, Wolf's medical provider reported that she would be able to return to work by September 30, 2020. [58] ¶ 68. Wolf testified she believed this timeline was an accurate estimate. *Id.*

Because Wolf would not have been able to return to work at the end of her FMLA leave, she was not entitled to reinstatement. *See James*, 707 F.3d at 780–781; *Franzen*, 543 F.3d at 426. Wolf shows no disputed material fact that would allow a jury to find that her inclusion in the RIF and termination on the last day of her leave denied her FMLA benefits to which she was entitled. Therefore, the Hospital is entitled to summary judgment on this claim.

### D. FMLA Retaliation

Wolf also brings a claim for FMLA retaliation. To prove retaliation, a plaintiff must show that "(1) [she] engaged in a protected activity; (2) [her] employer took an adverse employment action against [her]; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel v. TIN Inc*, 695 F.3d

622, 631 (7th Cir. 2012). There is no dispute that Wolf took protected medical leave that was approved to run from March 27, 2020, through June 18, 2020. [58] ¶¶ 63–64; [63] ¶ 38. The parties also do not dispute that termination is an adverse employment action. [52] at 13–14; [57] at 12.

The only issue here is whether Wolf has "present[ed] evidence that her employer took a materially adverse action against her because of her protected activity." *See Goelzer*, 604 F.3d at 995 (citing *Burnett*, 472 F.3d at 481). To survive summary judgment, Wolf must create a triable issue of whether there was discriminatory or retaliatory intent in her discharge. *See id.* Wolf does not need to prove that "retaliation was the only reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Id.* (quotation omitted).

The Hospital introduced evidence that Wolf was fired for a facially legitimate reason: the Hospital needed to cut operational costs substantially during the pandemic to stay afloat and believed that it could eliminate Wolf's position and retain her high executive-level salary. [58] ¶ 74. Wolf presents no evidence that the Hospital was not in a financial crisis, nor that eliminating her position was not a cost-savings measure.[5] It is undisputed that the Hospital was facing severe financial stress, to the point it almost didn't make payroll a few times, [58] ¶¶ 25, 70–71; that the RIF

---

[5] Although her opinion is likely inadmissible as irrelevant and without foundation, Wolf believed that Medaglia included her and three other HR employees in the RIF and ended her employment to "punish" her for disagreeing with him about whether administrative employees could work remotely during the pandemic and due to tensions caused by HR's resistance to come into the Hospital to assist during the pandemic. [58] ¶ 75. These motives are not retaliatory under the FMLA.

included multiple other employees, [58] ¶ 73, [63] ¶ 36; and that Wolf's high executive-level salary was "very competitive." [58] ¶¶ 57, 74.

Wolf offers two forms of circumstantial evidence—suspicious timing and evidence of pretext—from which she argues a jury could reasonably find that the Hospital fired her because she took FMLA leave.

Wolf argues that her termination was suspiciously close in timing to her FMLA leave and potential reinstatement—she was discharged on her last day of protected leave. [63] ¶ 38. When "an adverse action comes so close on the heels of a protected act … an inference of causation is sensible." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011). The inference of causation based on timing in this case is not so stark. Medaglia decided to include Wolf at the same time as all other terminated employees, weeks before the end of Wolf's FMLA leave. [63] ¶ 36. Wolf has presented no evidence to contradict this account. The Hospital concedes, however, that Wolf's FMLA leave informed the timing of its follow through. [63] ¶ 36. Although the Hospital could argue that it delayed its decision so as to not interfere with Wolf's leave, an inference in Wolf's favor suggests that her termination was suspiciously timed to her FMLA leave.

But "suspicious timing alone is rarely enough by itself," and a "plaintiff must ordinarily present other evidence that the employer's explanation for the adverse action was pretext for retaliation." *Tibbs v. Admin. Off. of the Illinois Cts.*, 860 F.3d 502, 505 (7th Cir. 2017) (citing *Harden*, 799 F.3d at 864–65).

24

"[P]retext 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" *Id.* at 506 (quoting *Burton v. Bd. of Regents*, 851 F.3d 690, 698 (7th Cir. 2017)). "Merely disagreeing with an employer's reasons does not meet this standard." *Id.* A plaintiff must point to "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate" the termination. *Id.* (citing *Carter v. Chicago State Univ.*, 778 F.3d 651, 659 (7th Cir. 2015)). A proffered reason cannot be pretextual "unless it is shown both that the reason was false, and that discrimination was the real reason." *King v. Preferred Tech. Grp.*, 166 F.3d 887, 893 (7th Cir. 1999).

Wolf has failed to offer evidence to support an inference that the Hospital's reason for eliminating Wolf's position—costs-savings during a financial crisis—was factually baseless, was not the actual motivation for her discharge, or was insufficient to motivate her termination.

According to Wolf, the criteria for including other employees in the RIF (decreased productivity and minimum value to the Hospital during the pandemic) did not apply to her. [57] at 12–13. But the Hospital does not say that Wolf was included in the RIF for these same reasons—she was included in the RIF as a cost-savings measure. [58] ¶ 74. Even if decreased productivity and valuation based on pandemic considerations applied to Wolf, she fails to present evidence that these reasons were pretextual. Wolf argues that she was meeting expectations and had no decrease in productivity, other than when she was out on leave, which would have been

25

impermissible for the Hospital to consider. [57] at 13 (citing *Pagel*, 695 F.3d at 629). Wolf also presents some evidence that her position was important to the Hospital. But this evidence of her position's importance is either from before or right at the start of the pandemic crisis. *See* [63] ¶ 2 (Upon being hired, Medaglia told Wolf that her position "[was] critical to assuring the hospital's future."); [63] ¶ 28 (Before Wolf went on leave in March 2020, Medaglia considered offering her a retention bonus and denied her PTO because HR was understaffed.). This evidence does not support an inference that, during the pandemic, the HR department and Wolf's executive-level position were as valuable to the Hospital as they were before.

Wolf also points to a lack of documentation as to why she was included in the RIF, [63] ¶¶ 33, 35, and that Medaglia did not ask the incoming head of HR for any productivity or value information on Wolf before selecting her position for termination, [63] ¶ 34. While this type of documentation would have been expected as a regular HR practice, [63] ¶ 33, lack of documentation does not inherently support pretext. *See, e.g.*, *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 826–27 (7th Cir. 2006) (holding that "in complaining about the lack of documentation, the plaintiffs are not really challenging the veracity of [the employer's] proffered reason."). Wolf also notes that she was not included on the initial list of employees included in the RIF and was let go a month later than the other employees. [63] ¶ 35. But as noted above, the Hospital proffered a reason for the delay, one that concedes that Wolf's FMLA leave was on the employer's mind. But that reason does not suggest that the

Hospital's cost concerns weren't genuine. This is no more than suspicious timing, and not evidence of pretext.

Wolf also argues that her position was not truly eliminated, based on evidence that a promoted employee was tasked with many of Wolf's former duties. [57] at 14; [63] ¶ 39. But the undisputed evidence shows that while the promoted employee led the HR department, she did not have Wolf's executive-level responsibilities, which were instead given to the Hospital's general counsel. [58] ¶ 77. That promoted employee was also paid at a lower rate, still saving the Hospital money. [58] ¶ 74.

Even drawing all reasonable inferences in her favor, Wolf's evidence would not allow a jury to find the Hospital's proffered reason for termination—cost-savings— was pretextual.

Further, because there is no dispute that Wolf could not return to work upon the expiration of her FMLA leave, and therefore no question as a matter of law that Wolf had no right to reinstatement, she has no claim for damages under the FMLA. *See Franzen*, 543 F.3d at 426 ("An employee also has no right to reinstatement—and, therefore, damages—if, at the end of his twelve-week period of leave, he is either unable or unwilling to perform the essential functions of his job."). Wolf lost no compensation by reason of the alleged retaliation and incurred no apparent monetary losses as a direct result of the alleged retaliation. Equitable relief (such as reinstatement or promotion) would not be appropriate because any FMLA retaliation did not harm her future prospects at the Hospital—she could not have returned to work within the FMLA protected window no matter the retaliatory motive in the

27

termination of her employment. When an employee is unable to return to work at the expiration of their FMLA leave, an employer can terminate the employee, and the employee is not entitled to damages related to their discharge. *Id.*

Summary judgment on Wolf's FMLA retaliation claim is granted.

## IV. Conclusion

Defendant's motion for summary judgment, [51], is granted. Enter judgment in favor of defendant and terminate civil case.

Enter:

_____
Manish S. Shah
United States District Judge

Date: November 14, 2023